**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MEGAN McGOWAN,

      Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

      Defendant.

No. 18-cv-12543-RGS

**REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION
TO REVERSE THE DECISION OF THE ACTING COMMISSIONER
AND THE COMMISSIONER'S MOTION TO AFFIRM**

CABELL, U.S.M.J.

## I.   INTRODUCTION

Plaintiff Megan McGowan seeks an order reversing a decision of the Acting Commissioner (the Commissioner) of the Social Security Administration (SSA) denying her application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) based on physical disabilities.  (D. 15). The Commissioner in turn seeks an order affirming her decision. (D. 17).  The matter has been referred to this court for a Report and Recommendation.  As discussed more fully below, I recommend that the Commissioner's motion to affirm be GRANTED and the plaintiff's motion to reverse be DENIED.

## II. PROCEDURAL HISTORY

The plaintiff applied for DIB and SSI on July 25, 2016, alleging disability beginning on June 23, 2016. (SSA Administrative Record of the proceedings, pp. 215, 219 (R. __)). The SSA denied the application twice, first on August 25, 2016, and then again on February 23, 2017, following McGowan's request for reconsideration. (R. 131, 138). On March 27, 2018, an administrative law judge (ALJ) convened a hearing and subsequently found on May 1, 2018 that McGowan was not disabled within the meaning of the Social Security Act (Act). (R. 12-23). On October 12, 2018, the Appeals Council denied McGowan's request for review of the ALJ's decision, making that decision the final decision for purposes of this appeal. (R. 1).

## III. FACTS

### A. Plaintiff's Background

McGowan completed 10th grade and did not obtain a GED. She previously worked as an assistant manager of a pizza shop, a security guard at a light work level,[1] a coffee shop counter attendant, and a cook, and was just under 28 (27 years, 10 months) at the time of her alleged onset of disability. (June 23, 2016). She initially alleged disability due to an L1-S1 herniated disc, chronic back pain, and bulging disk, and later reported lateral

---

[1] McGowan worked at a platinum and silver facility checking workers' clothing and personal items for theft.

femoral cutaneous sensory neuropathy, Hashimoto's disease, and migraine headaches. (R. 14-15, 61, 69, 112).

**B. Relevant Medical Evidence**

    1. Back and Leg-Related Evidence

McGowan started experiencing chronic low back pain in 2014, which she managed with tramadol and gabapentin. (R. 359-61). On March 24, 2016, McGowan visited the Sturdy Memorial Hospital emergency room complaining of sharper and more persistent pain radiating from her right lumbar area to her left. (R. 363). After she refused an injection of pain medication, she was told to rest her back and follow up with her regular physician. (R. 364).

The following day, McGowan saw her primary care provider, Jennifer LaCourse, N.P., and reported the same back pain as well as stabbing and burning pain in her right thigh. (R. 359). N.P. LaCourse referred McGowan for a lumbar spine MRI, which showed that while McGowan had mild disc bulging, there was no significant pathology at L1-2. (R. 357).

On April 26, 2016, McGowan had a neurosurgery consultation with Thai Vu, P.A., who reviewed her 2014 MRI and found no clear reason for McGowan's increased pain.[2] (R. 336). Vu then had McGowan undergo an electromyography (EMG) on July 28, 2016 to investigate other possible causes. (R. 340). The examining

---

[2] It is not clear why P.A. Vu did not review McGowan's 2016 MRI.

physician, Peter Siao Tick Chong, M.D., found neurophysiologic evidence of lateral femoral cutaneous sensory neuropathy on the plaintiff's right thigh. He also declared his findings consistent with L5, S1 radiculopathy on the right and noted mild chronic devernation changes in the right gluteus maximus. (R. 341). According to examination notes from N.P. LaCourse, McGowan was told that her leg pain was independent of her back pain and that she had meralgia paresthetica. (R. 345).

In September 2016 Keith Davies, M.D., a specialist in peripheral nerve issues, examined McGowan. He noted that McGowan's lumbar flexation was "limited and painful" and that her sensation on the anterolateral section of her right thigh was "markedly reduced." She also had reduced sensation in the medial section of her right thigh, her lateral right leg, and lateral aspects of her right foot. (R. 396-97).

Based on his examination, Dr. Davies concluded McGowan most likely had symptoms from both the meralgia paresthetica and radiculopathy. However, he considered her lateral femoral cutaneous nerve lesion to be the most significant cause of her symptoms and recommended trying an injection into the nerve. Dr. Davies referred McGowan to another physician for his opinion, but there is no indication in the record that McGowan ever saw that physician. (R. 397).

In October 2016, McGowan told N.P. LaCourse she would be

receiving the nerve injection, but not until February 2017. (R. 404). LaCourse recommended that McGowan see a specialist in pain medication management, and McGowan began seeing Christopher Hummel, D.O. in March 2017. (R. 433). Dr. Hummel administered lumbar epidural steroid injections to McGowan in late March and May 2017 (R. 425, 429), but McGowan reported that neither injection had relieved her pain. Further, she felt her pain was progressing and she was now experiencing a new symptom of numbness and tingling in her toes. (R. 422). According to examination notes from N.P. LaCourse, Dr. Hummel had ordered a facet injection for McGowan's spine, but her insurance company denied coverage. Insurance also denied coverage for a femoral nerve block for her thigh. (R. 449).

In September 2017, McGowan had an updated MRI of her spine, which was compared to her two earlier MRIs. (R. 437). The 2017 MRI revealed a new small central disc herniation at L4-5. Additionally, McGowan's right L5 nerve root sheath appeared swollen. (Id.). However, the examining physician described all affects and stenosis as "mild." (Id.).

In November 2017, Owen Debowy, M.D., a physician in the same practice as N.P. LaCourse, prescribed a rolling walker for McGowan. Dr. Debowy had had seen McGowan during her 2016 emergency room visit and had been copied on Dr. Davies' assessment. (R. 363, 399).

5

### 2. State Medical Consultants

Two state medical consultants reviewed McGowan's records in connection with her initial claim for benefits and her reconsideration request.  In a report dated August 25, 2016, Wayne Draper M.D., found McGowan's back issues to be primary and severe but nonetheless determined that she could stand or sit for about six hours in an eight-hour workday and occasionally climb stairs or ramps, balance, bend at the waist, kneel, crouch, and crawl. The primary limitation he noted was in McGowan's lower right extremities, which could do only occasional pushing or pulling. (R. 69, 73-77).

In a report dated January 24, 2017, Eduardo Haim, M.D., essentially confirmed Dr. Draper's findings.  He found McGowan's ability to climb stairs, balance and crouch to be unlimited, even though this second evaluation also included consideration of McGowan's EMG results and noted that McGowan had "lateral femoro cutaneous sensory neuropathy."  Dr. Haim also determined that she could bend at the waist frequently.  (R. 89-97).

### 3. Evidence From the Administrative Hearing

The ALJ convened an administrative hearing on March 27, 2018 and McGowan testified regarding the physical limitations caused by her back and leg issues.

Regarding her back, McGowan said she had disc problems and had received cortisone shots which proved ineffective.  (R. 45).

She testified that back pain caused her to have to shift positions frequently while sitting, and that she would have difficulty sitting still for even a half-hour television program. (R. 58).

Concerning her leg, McGowan testified that she has a nerve condition that affects her balance and causes her to fall easily if she is standing or walking for too long. (R. 45). She said she had discussed back surgery with her doctors but reported that surgery might make her back and leg pain worse and even result in paralysis. (R. 46).

McGowan said she stopped doing household chores such as laundry and cleaning about the middle of 2017, when she started to have balance issues. She reported that a walker helped her to take her dog outside and give him food and water. She also indicated that she went shopping with her boyfriend once or twice a month, attended her son's BMX motocross races, and could prepare simple meals in the microwave on a daily basis. (R. 50-52).

The ALJ also took testimony from a vocational expert. The expert was asked if McGowan could perform any work assuming she had to avoid even moderate exposure to unprotected heights and moving and dangerous machinery, but otherwise had the following capabilities for a person of her age, education, and background:

> lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting, standing, and/or walking for six hours out of an eight-hour workday; and occasionally climbing stairs and ramps, balancing, stooping, crouching, kneeling, or crawling.

(R. 62-63).  The expert responded that McGowan could perform all her previous jobs as well as other light jobs such as marker, convenience store cashier, and hand packer.  (Id.).

The ALJ then asked the expert to assume the same hypothetical except that McGowan would be limited to three hours of standing or walking per workday.  The expert replied that McGowan could work in sedentary jobs such as bench worker, circuit board screener, and electronics inspector.  (R. 63-64).

When McGowan's attorney asked what jobs McGowan could perform if she relied upon a walker for balance, the expert said all light jobs would be precluded but that McGowan could still perform the sedentary jobs.  (R. 64-65).  The expert acknowledged, however, that a person relying on a walker would need to have work brought to her, and that jobs where the person would have to walk to obtain her work would be eliminated.  (R. 65-66).

## IV.  THE ALJ'S FINDINGS

On May 1, 2018, the ALJ found that McGowan was not disabled within the meaning of the Social Security Act.  (R. 31).  In reaching this determination, the ALJ applied the familiar five-step sequential evaluation established by the Social Security Administration.  20 C.F.R. §§ 404.1520(a), 416.920(a).

Step one considers whether the plaintiff is engaged in substantial gainful activity ("SGA"), because a claimant who is so

8

engaged is not disabled.  20 C.F.R. § 404.1520(b).  SGA is defined
as work activity done for pay that involves performing significant
physical or mental activity.  20 C.F.R. §§ 404.1572(a)-(b).  The
ALJ found that the plaintiff had not engaged in SGA since the
alleged onset date of her disability, June 23, 2016.  (R. 14).

Step two considers whether the plaintiff has a medically
determinable impairment that is severe, or a combination of
impairments that is severe as defined by the pertinent regulations.
20 C.F.R. § 404.1520 (c).  A plaintiff who does not have an
impairment that is severe is not disabled.  Here, the ALJ found
that the plaintiff suffered from these severe impairments:  low
back pain secondary to minor degenerative changes with associated
facet arthropathy and hypertrophy, as well as minor degree of
lateral recess stenosis bilaterally at L3-L4, L4-L5, and L5-S1;
lateral femoral cutaneous sensory neuropathy of the right lower
extremity; and obesity.[3]  (R. 14).  The ALJ reached this conclusion
after determining that the impairments "imposed more than a minimal
limitation on the claimant's ability to perform basic work
activities during the time period in question (20 C.F.R.
416.920(c))."  (R. 14-15).

Step three considers whether the claimant's impairment or
combination of impairments is of a severity to meet or medically

---

[3] The ALJ did not find McGowan's Hashimoto's disease or migraines to be severe.
McGowan does not challenge that determination here.

equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   20 C.F.R. §§ 416.920(d), 416.925, and 416.926.   If so, the claimant is conclusively presumed to be disabled.   If not, one moves to the next step.   The ALJ found here that the plaintiff's impairments did not meet or medically equal the severity criteria of an impairment listed in the pertinent regulations and accordingly moved to step four.   (R. 15).

Step four considers the claimant's residual functional capacity (RFC) to work and entails a two-part inquiry.   In the first part the ALJ determines whether the claimant's RFC allows her to work at all, *i.e.*, whether she has the ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.   20 C.F.R. § 416.920(f).   In the second part the ALJ determines whether the claimant's RFC allows her to perform her past relevant work.   20 C.F.R. § 416.920(f).   If the claimant has the RFC to do her past relevant work, she is not disabled.   If not, the analysis proceeds to the fifth and final step, which entails asking whether there are any jobs in the national economy the claimant is capable of performing.

At the first stage of this inquiry the ALJ found that the plaintiff had the RFC to perform light work with the following qualifications: "she could occasionally climb, balance, stoop, kneel, crouch, but she could never climb ladders, ropes, or scaffolds," and "should avoid even moderate exposure to workplace

hazards, such as dangerous machinery or unprotected heights." (R. 15).

In making this assessment, the ALJ found that, while the plaintiff's medically determinable impairments could reasonably be expected to cause the plaintiff's claimed symptoms, the plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical and other evidence before him. The ALJ acknowledged the sensory issues with McGowan's thigh, her limited range of lumbar motion, and her use of a walker, but noted that her medical records consistently indicated a normal gait. The ALJ also noted that McGowan had never been deemed a candidate for surgery, and opted not to pursue nerve blocks. (R. 18-19).

The ALJ gave "great weight" to the evaluation of Dr. Draper, and "somewhat greater weight" to the evaluation Dr. Haim, noting that Dr. Haim had access to "a somewhat more complete longitudinal view of the medical evidence of record, including the later EMG and [2016] MRI findings." (R. 19).

In contrast, the ALJ gave little weight to that fact that N.P. LaCourse had completed a form for McGowan indicating that she could not return to work until further notice. He noted that the form had been completed in August 2016, which meant that "she did not have access to [McGowan's] objective findings and response to medical treatment over the majority of the period in question."

The ALJ also noted that the determination of disability is a matter reserved to the Commissioner.  Finally, the ALJ found that N.P. LaCourse's opinion was inconsistent with the record as a whole. (Id.).

The ALJ further noted that McGowan had not raised any issue of side effects from her medication, and she had achieved some relief with her medication.  Further, her day-to-day activities, which included walking her dog, preparing simple meals, attending to basic household chores and laundry, and attending medical appointments, were not consistent with the claimed disability. (R. 19-20).  The ALJ did consider McGowan's testimony that her range of daily activities was more limited but he found this evidence to be outweighed by other considerations because (1) her claimed limited daily activities could not be objectively verified; and (2) even if her daily activities truly were limited, it was difficult to attribute such limitation to her medical condition.  (Id.).

The ALJ found at the second part of the step four inquiry that McGowan had the RFC to perform her past relevant work.  (R. 20-21).  Although such a finding would as noted above compel a finding that the claimant is not disabled, the ALJ went on to issue alternative findings for step five, which considers whether the plaintiff is capable of performing any other work in the national economy given her RFC, age, education, and work experience in

conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (R. 47). Based on the record and the vocational expert's testimony, the ALJ found that the plaintiff could perform other light representative occupations such as a marker, convenience store cashier, and hand packer. (R. 22). He further found each of these positions existing in significant numbers in the national economy. (Id.). The ALJ accordingly determined that the plaintiff was not disabled. (R. 22-23).

## V.   STANDARD OF REVIEW

A court reviews the findings of an ALJ only to determine whether the findings are supported by substantial evidence, and whether the correct legal standard was applied. *Teague v. Colvin*, 151 F. Supp. 3d 1, 2 (D. Mass. 2015). Substantial evidence to support a decision exists if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Id.* This court must keep in mind that it is the role of the ALJ, and not this court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence. *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).

This court may affirm, modify, or reverse the ALJ's decision, but reversal is warranted only if the ALJ made a legal or factual error in evaluating the plaintiff's claim, or if the record contains no "evidence rationally adequate . . . to justify the

13

conclusion" of the ALJ.  *Roman–Roman v. Comm'r of Soc. Sec.*, 114 F. App'x 410, 411 (1st Cir. 2004).   This court therefore must affirm the ALJ's decision if it is supported by substantial weight, even if the record could arguably support a different conclusion. *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).   "The ALJ's findings of fact, however, 'are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.'"  *McCoy v. Colvin,* No. 14-cv-30188-KAR, 2015 WL 4602011, at *2 (D. Mass. July 31, 2015) (quoting *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir. 1999)). Thus, if the ALJ made a legal or factual error, the court may reverse or remand for consideration of new material evidence or to apply the correct legal standard.  *See Manso-Pizarro v. Sec'y of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996); 42 U.S.C. § 405(g).

## VI.  ANALYSIS

### A. Step Four RFC Determination

The ALJ determined at step four that McGowan had the RFC to perform light work with the qualifications that "she could occasionally climb, balance, stoop, kneel, crouch, but she could never climb ladders, ropes, or scaffolds," and "should avoid even moderate exposure to workplace hazards, such as dangerous machinery or unprotected heights."  In so finding, the ALJ gave "great weight" to the opinions of the state agency consultants, Doctors Draper and Haim, rendered on August 25, 2016 and January

24, 2017, respectively.  (R. 15, 19).

The plaintiff contends that the ALJ erred in giving great weight to their opinions because evidence postdating their opinions suggested that the plaintiff's conditions were more limiting than their opinions suggested.  The plaintiff contends specifically that the consultants failed to consider:  (1) a March 15, 2017 positive bilateral straight leg raise; (2) March 23 and May 25, 2017 lumbar epidural steroid injections; (3) a June 13, 2017 report of increasing pain, along with bilateral pain, tingling, and numbness in her feet after injections; (4) a May 18, 2017 examination showing bilateral lumbar muscle tenderness and spasm and walking with a slight limp; (5) an August 29, 2017 report of lumbar and right paraspinal tenderness and using a walker outside; (6) a September 15, 2017 report of a lumbar spine MRI showing new central disc herniation/superior extrusion with mass effect upon the ventral thecal sac and diffuse disc bulge, and the appearance of swelling of the right L5 nerve root; and (7) a November 8, 2017 prescription for a rolling walker.

This matters, potentially, because a state agency consultant's opinion cannot serve as substantial evidence if it is based on a significantly incomplete record.  *Alcantara v. Astrue*, 257 F. App'x 333, 334 (1st Cir. 2007); *Roshi v. Comm'r of Soc. Sec.*, 14-cv-10705-JGD, 2015 WL 6454798, at *12 (D. Mass. Oct. 26, 2015). However, if the information in the evidence the consultant

considers remains accurate, an ALJ may rely on the consultant's opinion notwithstanding that new evidence has since been submitted. *See Blackette v. Colvin*, 52 F. Supp. 3d 101, 113 (D. Mass. 2014); *Abubakar v. Astrue*, No. 11-cv-10456-DJC, 2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012); *Mary Christine K. v. Comm'r of Soc. Sec.*, No. 18-cv-004-CJP, 2018 WL 4144507, at *5 (S.D. Ill. Aug. 30, 2018) (ALJ could rely on earlier reports where additional records contained nothing qualifying as "new, significant, and potentially decisive"); *Ferland v. Astrue*, No. 11-cv-123-SM, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011) (state examiners' assessments may be relied upon if arguably consistent with newer records). Accordingly, a medical opinion is not stale or unreliable merely because it predates other evidence in the record as long as the subsequent evidence does not undermine the opinion evidence. *Davis v. Comm'r of Soc. Sec.*, No. 18-CV-194P, 2019 WL 4315749, at *4 (W.D.N.Y. Sept. 12, 2019). Indeed, "'in every claim for DIB or SSI before an ALJ, some time will elapse between the date that a medical opinion about a claimant's condition is rendered and the date the ALJ considers that opinion'" and "'the SSA's disability determinations would cease to function if ALJs could not rely on a medical opinion simply because some new evidence entered the record after the opinion was provided.'" *Id.* (quoting *Morgan v. Astrue,* No. 3:09-CV-262, 2010 WL 3723992, at *13 (E.D. Tenn. June 30, 2010)).

That is what the Commissioner argues here.  The Commissioner notes as an initial matter that the first "new" cited piece of evidence, tenderness and a positive straight leg raise test, was not new at all and merely duplicated earlier evidence Dr. Haim considered.  More generally, the Commissioner argues that, even accepting that Dr. Draper and Dr. Haim did not consider evidence postdating their opinions, it did not matter because the new evidence did not indicate any appreciable change in McGowan's symptoms or functional limitations. *See McNelley v. Colvin*, No. 15-1871, 2016 WL 2941714, at *2 (1st Cir. Apr. 28, 2016) (ALJ did not err in giving substantial weight to opinion rendered prior to certain treatment records because those records indicated "no appreciable changes in [the claimant's] symptoms or functional limitations").  The court agrees.  It was not error here to accord great weight to the state agency consultants' opinions because the additional evidence McGowan cites did not show "additional limitations" suffered since the reconsideration decision on February 23, 2017.

To begin, as noted by the Commissioner, the plaintiff's previous records documented bilateral straight leg raises and lumbar tenderness, and the record shows that the consultants took these factors into account. (R. 81).  Thus, the new records reflecting these impairments -- cited in the plaintiff's list of additional evidence as numbers one, four and five above -- were

17

merely cumulative. *See, e.g., Dias v. Colvin*, 52 F. Supp. 270, 285 (D. Mass. 2014) (ALJ's alleged failure to consider certain evidence not error where evidence is cumulative).

Moreover, while N.P. LaCourse found McGowan in the fourth piece of evidence cited above to be walking with a slight limp in a May 18, 2017 examination (R. 517-520), she also noted that McGowan had recently fallen on her flank area in the shower, an event that could have well been the cause of any limp, and indeed Dr. Hummel observed just a week later that McGowan had no pain with weightbearing.    (R. 532).    Likewise, N.P. LaCourse subsequently found McGowan's station and gait to be normal in an August 29, 2017 examination.    (R. 532).    Thus, to the extent the consultants did not take a single report of limping into account, or for that matter a June 2017 report of numbness and tingling in McGowan's feet, number three cited above, these failures do not undermine their opinions or call into question the ALJ's conclusion that McGowan's "examination findings have consistently failed to substantiate the presence of significant gait abnormalities." (R. 19).    And for the same reasons, as well as the lack of an explanation from Dr. Debowy on why McGowan was prescribed a walker in number seven cited above, the ALJ did not err in determining that McGowan's need for such a device was inconsistent with her records.

Further, the failure of the consultants to consider in number

two above the evidence of McGowan's lumbar epidural steroid injections is inconsequential because the ALJ asked McGowan about the injections at the administrative hearing and she reported that they had not helped her. (R. 45-46).

To be sure, McGowan's September 2017 spine MRI, in number six above, was not considered by the consultants nor discussed by the ALJ in any detail. (R. 18). That MRI showed that "[a]t L4-5, there is a new small central disc herniation/superior extrusion with mild mass effect upon the ventral thecal sac. Additionally, there is a diffuse bulge again noted. Ligament flavum hypertrophy along with the disc pathology, results in mild spinal stenosis. Additionally, the right L5 nerve root sheath appear[sic] swollen." (R. 437). However, the ALJ did find that McGowan had a severe impairment of "low back pain secondary to minor degenerative changes . . . as well as minor degree of lateral recess stenosis bilaterally at L3-L4, L4-L5, and L5-S1." In this light, the 2017 MRI did not document an appreciable change in McGowan's functional limitations as the ALJ assessed them. The disc herniation observed in the 2017 MRI was "small" and produced only a "mild mass effect" on the ventral thecal sac at L4-5. (R. 437). Further, McGowan has not provided any specific examples of how the findings of the 2017 MRI would negatively impact her functional ability. *Cf.* *Wilson v. Berryhill*, No. 3:17-cv-407-PLR-HBG, 2018 WL 7891892, at * 6 (E.D. Tenn. Dec. 17, 2018) (new evidence of possible herniated

19

disc not material when claimant could not explain how this evidence would impact the ALJ's RFC determination).

In sum, the post-reconsideration evidence did not undermine the consultants' opinions and the ALJ therefore did not err in according them great weight.[4]

### B. Step Four Previous Work and Step Five Determinations

McGowan also argues that the vocational expert failed to take her use of a walker into account and for that reason erred at step four in finding her capable of performing her relevant past work, and erred also at step five in determining there were jobs she could perform in the national economy.  This argument fails easily. As discussed above, the ALJ determined that McGowan's need for a walker was not substantiated by the record, and the court finds no error in this determination.  None of McGowan's treating medical personnel provided any reason for why she needed a walker.  And, with the exception of one examination, her medical records consistently showed that she had a normal gait.

---

[4] The plaintiff also appears to argue that, even assuming the ALJ could reasonably rely on the consultants' opinions, the opinions were still not entitled to great weight where they failed to "restate" Dr. Davies's September 2016 diagnosis of meralgia paresthetica, or the plaintiff's lateral femoral cutaneous nerve lesion, which Dr. Davies considered to be the most significant cause of her symptoms.  However, Dr. Haim specifically referenced the claimant's EMG and a finding of "right lateral femoral cutaneous nerve palsy."  (R. 127). The court takes judicial notice that lateral femoral cutaneous neuropathy is synonymous with meralgia paresthetica.  *See* Mayo Clinic, Meralgia paresthetica, https://www.mayoclinic.org/diseases-conditions/meralgia-paresthetica/symptoms-causes/syc-20355635 (Jan. 16, 2020).  As such, Dr. Haim did take Dr. Davies's diagnosis into account in evaluating the plaintiff's capabilities and providing his opinion.

Moreover, McGowan complains that the vocational expert erred at step five in not explaining how she could perform certain sedentary positions when they might require her to walk to obtain her work. However, it is not necessary to consider this argument where the court finds no error in the ALJ's determination at step four, part two that the plaintiff had the RFC to perform her past relevant work.  The ALJ issued his step five determination as an alternative finding only. *Cf. Lindsey v. Soc. Sec. Admin. Comm'r*, No. 1:10-cv-00038, 2011 WL 86567, at *2 (D. Me. Jan. 10, 2011) (citations omitted) (ALJ does not err in making alternative findings at step five because they can provide basis for affirmance if step four findings are rejected).

## VII. Conclusion

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (D. 15) should be **DENIED** and the Defendant's Motion to Affirm the Commissioner's Decisions (D. 17) should be **GRANTED**.[5]

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: March 5, 2020

---

[5] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).